UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

       Plaintiff,             CIVIL ACTION

      v.                  NO. 1:09-CV-3600-CAP

NICOLAS PATRICK BENOIT
CONDROYER,
       Defendant.

**O R D E R**

This matter is before the court on the defendant's motion to dismiss [Doc. No. 19]. For the following reasons, the motion is denied.

**I.   Background**

On December 22, 2009, the U.S. Securities and Exchange (SEC) filed this securities enforcement action against the defendant,[1] under 15 U.S.C. § 78u. The facts of the complaint and the relevant proceedings thus far are summarized here.

**A.   Facts as Alleged in the Complaint**

Sanofi-Aventis (Sanofi) is a French corporation based in Paris, France, and Chattem, Inc., (Chattem) is a publicly-traded U.S. corporation located in Chattanooga, Tennessee. By November, 2009, these two companies were engaged in negotiations that would

---

[1] A second defendant subsequently settled with the SEC [Doc. No. 30].

lead Sanofi to purchase Chattem at a price per share significantly higher than that at which Chattem was trading in November, 2009.

The defendant, Mr. Condroyer, is a French citizen residing in Belgium at the time. On November 26, Condroyer applied to open a stock options trading account at optionsXpress, Inc. (optionsXpress), an on-line brokerage firm in Chicago, Illinois. OptionsXpress approved Condroyer's account on November 30, 2009. Over the next two weeks, Condroyer transferred $44,000 into the account. Between December 7 and December 17, 2009, Condroyer spent approximately $42,000 to purchase 1,970 Chattem call option contracts in multiple transactions. Each contract gave him the right to buy one hundred shares of Chattem at either $75 or $80 per share. Chattem was trading at approximately $70 per share during the time Condroyer purchased the options. The option contracts cost between $10 and $30, and all but a few options would expire on January 16, 2010.

On December 21, before the day's trading began, Sanofi and Chattem announced the acquisition agreement, which provided that Chattem shareholders would receive $93.50 per share. Chattem's stock price rose to $92.79 per share that day. The price of options contracts traded at prices between $1,290 and $1,800 per contract. Subsequent to the public announcement, Condroyer sold all of his options and realized a net profit of approximately $2.8 million.

2

**B.   SEC's Attempts to Serve the Defendant**

After the court issued a preliminary injunction freezing the defendant's assets in the optionsXpress account [Doc. No. 6], there was no substantive action on the case for several months. On July 14, 2010, the court ordered the SEC to show cause why the action should not be dismissed for failure to prosecute [Doc. No. 10]. The SEC filed a response [Doc. No. 13] as well as a motion for leave to serve the defendant by publication [Doc. No. 12].

In these documents, the SEC explained its various unsuccessful efforts to serve Condroyer with the summons and complaint. Given the circumstances described in the motion and more fully below, the court found that service by publication was appropriate under the Federal Rules of Civil Procedure and Georgia law, and it would not contravene international law. Thus, on August 10, 2010, the court ordered the SEC to serve Condroyer by publishing a notice about the pendency of the action in the USA Today, the International Herald Tribune, and the Fulton County Daily Report once a week for four weeks [Doc. No. 15]. The SEC completed the publication of these notices on September 17, 2010 [Doc. No. 18].

## II. Discussion

Condroyer moves to dismiss the SEC's complaint on several bases. As an initial matter, he challenges this court's personal jurisdiction over him pursuant to Federal Rule of Civil Procedure

12(b)(2).  Second,  he  claims  insufficient  service  of  process
pursuant to Rule 12(b)(5).  Third, he argues that the complaint is
defective in that it fails to state a claim under Rule 12(b)(6) and
does not plead fraud with sufficient particularity under Rule 9(b).

**A.   Personal Jurisdiction**

The court did not hold an evidentiary hearing on the issue of
the court's jurisdiction, and the defendant presents no affidavits
disputing any of the alleged facts in the complaint.  Thus, the
standard to decide the issue of personal jurisdiction is clear: The
plaintiff  must  establish  a  prima  facie  case  of  personal
jurisdiction  over  the  defendant,  the  court  accepts  the  facts
alleged  in  the  complaint  as  true,  and  the  court  construes  all
reasonable inferences in favor of the plaintiff. SEC v. Carrillo,
115 F.3d 1540, 1542 (11th Cir. 1997).

The due process clause of the U.S. Constitution limits federal
courts' power to acquire personal jurisdiction over a nonresident
defendant, and due process is satisfied when "(1) the nonresident
defendant has purposefully established minimum contacts with the
forum  and  (2)  the  exercise  of  jurisdiction  will  not  offend
traditional  notions  of  fair  play  and  substantial  justice." Id.
(internal  quotations  omitted).  In  cases  where  jurisdiction  is
invoked based on federal securities laws, the applicable forum by
which to evaluate minimum contacts is the United States as a whole.

<u>Id.</u> at 1544. Thus, to establish minimum contacts for the purpose of specific jurisdiction, the SEC must establish that Condroyer's contacts with the United States must (1) be related to the SEC's cause of action or have given rise to it, (2) involve some act by which Condroyer purposefully availed himself of the privilege of conducting activities within the United States, thus invoking the benefits and protections of its laws, and (3) be such that he should reasonably anticipate being haled into court here. <u>See</u> <u>id.</u> at 1542.

Condroyer has minimum contacts with the United States based on his alleged conduct. He opened a brokerage account with a U.S. company, optionsXpress; bought call option contracts for a U.S. company, Chattem; and then sold those contracts for a large profit. These transactions were all governed by U.S. securities laws, and the conduct forms the core of the insider trading alleged in the complaint. <u>Cf.</u> <u>id.</u> at 1546 ("The applicable case law unequivocally establishes that maintaining bank accounts in the forum for purposes of carrying out the subject transactions constitutes purposeful availment and invocation of the benefits of the forum's laws."). Thus, he could reasonably anticipate being haled into court in the United States for conduct violating our securities laws. <u>See also</u> <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 473–74 (1985) ("[W]here individuals purposefully derive benefit from their

interstate activities, it may well be unfair to allow them to escape having to account . . . for consequences that arise proximately from such activities; the Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed." (citation and internal quotation omitted)). Had Condroyer not wished to subject himself to personal jurisdiction in the United States, he could have abstained from trading in U.S. markets.

Additionally, the exercise of personal jurisdiction over Condroyer does not offend traditional notions of fair play and substantial justice. To determine the fairness of a forum, "a court must consider, among other things, 'the burden on the defendant, the interests of the forum, and the plaintiff's interest in obtaining relief.'" Vermeulen v. Renault, U.S.A., Inc., 985 F.2d 1534, 1551 (11th Cir. 1993) (quoting Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 113 (1987)). "A 'primary concern' of the 'fairness' test is the burden placed on the defendant, and, in cases involving international defendants, courts should consider 'the unique burdens placed upon one who must defend oneself in a foreign legal system.'" Oldfield v. Pueblo De Bahia Lora, S.A., 558 F.3d 1210, 1221 (11th Cir. 2009) (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292 (1980); Asahi, 480 U.S. at 114). However, it is a "rare" or "highly unusual" case where a

6

defendant has sufficient contacts with the United States as a whole but is unduly burdened by the assertion of jurisdiction here. Republic of Panama v. BCCI Holdings (Luxembourg) S.A., 119 F.3d 935, 947 (11th Cir. 1997)).

In SEC v. Carrillo, a securities enforcement action brought in the Southern District of Florida, the defendants were a Costa Rican corporation and two of its officers, all domiciled in Costa Rica. The Eleventh Circuit brushed aside the defendants' argument that they would be burdened "as a foreign national having to litigate in the United States" because "'modern methods of transportation and communication' have ameliorated this sort of burden." Carrillo, 115 F.3d at 1547 (quoting Sculptchair, Inc. v. Century Arts, Ltd., 94 F.3d 623, 632 (11th Cir. 1996) (same, for Canadian defendant sued in Florida)). The court also recognized the "obvious interest in stamping out the type of nefarious economic chicanery alleged," and that the SEC had a "strong interest" in litigating the case in the forum and no other means of obtaining relief. Id. For the same reasons, the three fairness factors favor the SEC here, and the exercise of personal jurisdiction does not offend notions of fair play and substantial justice.

Condroyer argues it would be burdensome to "subject him to a foreign legal system based upon what were, at most, tangential contacts" with the United States [Doc. No. 19-1 at 17]. However, as

7

discussed above, his conduct was intentionally directed at the United States, he already chose to avail himself of the benefits (and burdens) of our securities laws, and any possible burden is lessened by his ability to defend this action via "modern methods of transportation and communication." Carrillo, 115 F.3d at 1547. Condroyer also appears to argue that "this District" has little to no interest in hearing this case, and we are only here because of the "seemingly random selection" by the SEC to bring the action here [Doc. No. 19, at 18].[2] But this argument is irrelevant quibbling with the choice of venue Congress gave to the SEC, as plaintiff: "An alien may be sued in any district," 28 U.S.C. § 1391(d), subject only to due process considerations. In his reply brief, Condroyer concedes that "a properly-plead [sic] complaint brought in a district that has an interest in the litigation would produce a result whereby the balance of the Asahi factors would warrant the application of personal jurisdiction." [Doc. No. 24 at 13]. Because Condroyer had minimum contacts with the United States, as required by Carrillo, any "district" is proper. Thus, this court has personal jurisdiction over Condroyer.

---

[2]     In the defendant's reply brief, he further argues, "Just because the SEC chose to investigate this matter in Atlanta does not give this Court an interest in hearing a case involving facts which all occurred in foreign districts and countries." [Doc. No. 24 at 12].

**B.    Insufficient Service of Process**

Condroyer also challenges under Rule 12(b)(5) whether he was properly served. Federal Rule of Civil Procedure 4(f)(3) states: "Unless federal law provides otherwise, an individual . . . may be served at a place not within any judicial district of the United States . . . by other means not prohibited by international agreement, as the court orders." Service pursuant to this rule must comply with constitutional notions of due process and provide "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950). "[I]n the case of persons missing or unknown, employment of an indirect and even a probably futile means of notification is all that the situation permits and creates no constitutional bar to a final decree foreclosing their rights." Id. at 317 (holding there was no constitutional problem with the published notice for defendants whose addresses were unknown). Thus, as a general proposition, service by publication can be a constitutionally sufficient form of notice. Moreover, "[r]easonable notice . . . requires only that the government attempt to provide actual notice; it does not require that the government demonstrate that it was successful in providing actual notice." Mesa Valderrama v. United States, 417 F.3d 1189,

9

1197 (11th Cir. 2005) (citing <u>Dusenbery v. United States</u>, 534 U.S. 161, 170 (2002)). "One factor in considering whether due process is satisfied is whether a defendant served by alternative means possesses some knowledge of the pending lawsuit against her." <u>SEC v. Shehyn</u>, No. 1:04-cv-2003-LAP, 2008 WL 6150322, at *3 (S.D.N.Y. Nov. 26, 2008); <u>see also</u> <u>U.S. Commodity Futures Trading Comm'n v. Lake Shore Asset Mgmt. Ltd.</u>, No. 1:07-cv-3598, 2008 WL 4299771, at *4 (N.D. Ill. Sept. 17, 2008) (holding "service by publication coupled with actual notice of this action" was constitutionally sufficient).

On August 10, 2010, this court granted the SEC's motion to order service by publication in the International Herald Tribune (IHT), USA Today, and the Fulton County Daily Report [Doc. No. 15]. Therefore, the question is whether this service was "reasonably calculated" under the circumstances to provide the defendant Condroyer with notice of these proceedings. It was. The SEC diligently attempted to serve Condroyer at his last known mailing address, the email address he provided to optionsXpress, the address of his last known employer; and the SEC hired a process server, bailiff, and attorney in Belgium to try to serve Condroyer. <u>See</u> SEC Mot. to Serve by Publication 3-5 [Doc. No. 12-1].

The defendant suggests that the selection of publications was not reasonably calculated to provide notice to him because two are

10

only published in the United States and all three are published in English. Def.'s Mot. to Dismiss 21 [Doc. No. 19-1]. However, courts have frequently condoned publication in the IHT as constitutionally sufficient. E.g., SEC v. Tome, 833 F.2d 1086, 1091, 1093-94 (2d Cir. 1987) (describing the IHT as "an English language paper which is widely read by the international financial community in Europe"); Shehyn, 2008 WL 6150322, at *3; Lake Shore Asset Mgmt., 2008 WL 4299771, at *4; Smith v. Islamic Emirate of Afghanistan, No. 3:04-cv-445-HEH, 2001 WL 1658211, at *3 (S.D.N.Y. Dec. 26, 2001) (authorizing service on Osama Bin Laden).

Further, although the IHT is published in English, not Condroyer's (presumably) native French language, there are two reasons this not a concern. First, as noted by the court in Tome, the IHT is "widely read by the international financial community in Europe." 833 F.2d at 1091. Condroyer traded in options of a foreign (to him) company, so it is not unreasonable to infer he might be such a reader within the European financial community. Second, Condroyer completed an English-language application for his optionsXpress account; thus, the court can infer Condroyer likewise can understand the English-language notice in the IHT.

Finally, the defendant has actual notice of this action based on his defense, the present motion, and the contact the SEC received from two different law firms stating they were acting on

behalf of Condroyer. <u>See</u> SEC Resp. to Mot. Dismiss 20 [Doc. No. 20]; SEC Mot. to Serve by Publication 5 [Doc. No. 12-1]. While the defendant correctly points out that actual notice "is not sufficient to cure defectively executed service," <u>Albra v. Advan, Inc.</u>, 490 F.3d 826, 829 (11th Cir. 2007), this is not a case of defective service that must be cured. Rather, the SEC made proper, diligent, yet unsuccessful attempts to serve the defendant, and the court exercised its discretion "to determine what alternative means of service is appropriate in [this] particular case." <u>U.S. Commodity Futures Trading Comm'n v. Aliaga</u>, 272 F.R.D. 617, 619 (S.D. Fla. 2011). Actual notice alone is not enough to constitute adequate service of process, but it is also "true that receipt of actual notice is an important factor in considering whether service of process is adequate. <u>Prewitt Enters., Inc. v. Org. of Petroleum Exporting Countries</u>, 353 F.3d 916, 925 n.14 (11th Cir. 2003) (citing <u>Hanna v. Plumer</u>, 380 U.S. 460, 463 n.1 (1965)); <u>see also Mesa Valderrama</u>, 417 F.3d at 1197 (reasonable notice requires an "attempt to provide actual notice"); <u>Shehyn</u>, 2008 WL 6150322, at *3 (actual notice is a "factor" in reasonableness); <u>Lake Shore Asset Mgmt.</u>, 2008 WL 4299771, at *4 (service by publication in IHT "coupled with actual notice" was constitutionally sufficient). Here, Condroyer's actual notice merely supports the conclusion that service by publication in the three newspapers was reasonably

calculated under all the circumstances to provide notice of the pendency of this action.

**C.   Sufficiency of Pleadings**

Finally, the defendant moves this court to dismiss the insider trading claims for failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b).

<u>1.   Allegations of the Complaint</u>

The SEC alleges insider trading violations under § 10(b) of the Exchange Act and Rule 10b-5 thereunder. Section 10(b) makes it:

> unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j. The SEC promulgated Rule 10b-5 pursuant to this section, making it unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

The Supreme Court has interpreted § 10b to prohibit "insider trading" under two theories. First, the "classic" theory essentially prohibits a "corporate insider" (e.g., directors, officers, employees) from trading on material nonpublic information obtained from his position within the organization. SEC v. Cuban, 620 F.3d 551, 553-54 (5th Cir. 2010) (citing Chiarella v. United States, 445 U.S. 222, 227-28 (1980); Dirks v. SEC, 463 U.S. 646 (1983)) (explaining the theory and its two variations involving "temporary insiders" and tippees whose "duty to disclose or abstain is derived from the corporate insider's duty to his shareholders"). Second, the "misappropriation" theory "holds that a person violates section 10(b) 'when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information.'" Id. at 554 (quoting United States v. O'Hagan, 521 U.S. 642, 652 (1997)). Both theories share the common requirement of a fiduciary or fiduciary-like duty. Thus, the basic elements of insider trading can be summarized as: (1) purchasing or selling a security (2) after receiving material nonpublic information (3) obtained or used in breach of a fiduciary or similar duty.

The gist of the factual allegations is that Condroyer possessed material, non-public information about the impending acquisition of Chattem by Sanofi [Doc. No. 1 ¶ 2], and he used this

14

knowledge to purchase options in Chattem immediately before Sanofi's acquisition caused the price of the stock to increase significantly. Thus, Condroyer reaped a substantial profit on the sale of his options. However, the SEC did not allege how Condroyer came to possess his material non-public information or indicate the theory under which the SEC would establish a breach of fiduciary duty to establish the Rule 10b-5 violation.

## 2.   Legal Standard

In order to survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555-56 (2007). The allegations of the complaint are accepted as true and all reasonable inferences therefrom are viewed in the in the light most favorable to the plaintiff. Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1198 n.2 (11th Cir. 2001). Allegations of security fraud under 10(b) and Rule 10b-5 are also subject to the heightened pleading standards of Rule 9(b). Id. at 1202.[3] Rule 9(b) requires that a party alleging fraud "state with particularity

---

[3] "[T]he 'more rigorous' pleading requirements under the [Private Securities Litigation Reform Act], which go beyond the Rule 9(b) requirements only apply to private securities fraud actions; they do not apply to a case, such as this, brought by the SEC." SEC v. ICN Pharm., Inc., 84 F. Supp. 2d 1097, 1099 (C.D. Cal. 2000); accord SEC v. Falor, No. 1:09-CV-5644, 2010 WL 3385510, at *3 n.4 (N.D. Ill. Aug. 19, 2010); In re Credit Acceptance Corp. Sec. Litig., 50 F. Supp. 2d 662, 675 (E.D. Mich. 1999).

the circumstances constituting the fraud." The Eleventh Circuit has also cautioned, "Rule 9(b) must not be read to abrogate Rule 8, however, and a court considering a motion to dismiss for failure to plead fraud with particularity should always be careful to harmonize the directive of Rule 9(b) with the broader policy of notice pleading." <u>Friedlander v. Nims</u>, 755 F.2d 810, 813 n.3 (11th Cir. 1985).

The heightened pleading standard of Rule 9(b) is relaxed when specific facts are "peculiarly within the defendant's knowledge or control." <u>Hill v. Morehouse Med. Assocs., Inc.</u>, No. 02-14429, 2003 WL 22019936, at *3 (11th Cir. Aug. 15, 2003) (applying relaxed standard in False Claims Act claims); <u>In re Rockefeller Ctr. Props., Inc. Sec. Litig.</u>, 311 F.3d 198, 216 (3d Cir. 2002); <u>Brown v. J.P. Turner & Co.</u>, No. 1:09-cv-2649-JEC, 2011 WL 1882522, at *2 (N.D. Ga. May 17, 2011) (noting that in such cases, "the complaint still must, adduce specific facts supporting a strong inference of fraud or it will not satisfy even a relaxed pleading standard." (internal quotations omitted)).

### 3.   Application of the Standards

The SEC's complaint satisfies both the Rule 12(b)(6) and 9(b) standards. As an initial matter, the court rejects the defendant's suggestion that the complaint "does not even allege that Mr. Condroyer was in possession of insider information." Def.'s Mot. to

Dismiss 5 [Doc. No. 19-1]. Paragraph 2 of the Complaint alleges Condroyer possessed "material non-public information concerning an impending acquisition of Chattem by Sanofi-Aventis." [Doc. No. 1]. Additionally the complaint details Condroyer's trades in Chattem call options before and after the acquisition announcement [Doc. No. 1 ¶¶ 14-15, 17, 19-21].[4]

Thus, the only difficult question is whether the complaint contains facts sufficient to infer this information was obtained or used in breach of some duty. Paragraph 25 of the complaint summarily alleges such a breach of duty but does not state from

---

[4] In the same section of his motion, the defendant suggests "the slightest independent analysis" using "simple arithmetic" would cause the SEC's allegation to "collapse like a house of cards." Def.'s Mot. to Dismiss 5, 6 [Doc. No. 19-1]. The court is also capable of simple math and performed such a "slight" analysis. The court disagrees with the defendant that "logically" he would have purchased Chattem stock if he were in fact in possession of insider information: If Condroyer invested only his original $42,000, it would only buy 600 shares of Chattem at $70 per share ($42,000 ÷ $70/share); selling those at $93.50 each would yield a profit only $14,100 ((600 shares x $93.50) - $42,000), compared to his $2.8 million profit on the options.

On the other hand, to purchase the same number of shares of Chattem as the defendant allegedly purchased in options (1,970 contracts for 100 shares each), it would have required a much more significant outlay of capital: 1,970 contracts x 100 shares per contract (or 197,000 shares) x $70 per share = $13,790,000. Further, his profit on those shares would be ((197,000 shares x $93.50) - $13,790,000), or $4,629,500. This is approximately 1.7 times the profit, but at an up-front cost of over $13 million. Stated another way, purchasing the shares would have given him approximately 33.6% profit, while the options yielded a profit over 66 times the investment. This "slight" analysis shows that the defendant's argument is the house of cards.

where it arises. That the SEC leaves open the theory under which it will attempt to prove the insider trading claim--classical or misappropriation--is not fatal, however. <u>SEC v. Yun</u>, 327 F.3d 1263, 1276 (11th Cir. 2003) ("[I]t makes 'scant sense' for the elements the SEC must prove to establish a § 10(b) and Rule 10b-5 violation to depend on the theory under which the SEC chooses to litigate the case. The tippee's liability should be determined under the same principles." (citation omitted)); <u>Stevens v. O'Brien Envtl. Energy, Inc.</u>, No. 94-cv-4577, 1999 WL 310550, at *3 (E.D. Pa. May 10, 1999) (finding it "immaterial" which theory the SEC was asserting).

In the light most favorable to the plaintiff, the timing and circumstances surrounding Condroyer's trades create the inference he did breach a fiduciary-like duty or received the information about the impending acquisition from someone who breached such a duty. Sanofi, the French company, publicly announced its acquisition of Chattem, the U.S. company, on Monday December 21. The parties had been negotiating the deal in November. Condroyer, a French citizen, applied to open a new brokerage account in the United States just over three weeks before the announcement. On Monday, December 7, as soon as his account was approved and only two weeks before the announcement, Condroyer began purchasing options in Chattem. He made his final purchase on Friday, December 18, the last trading day before the public announcement. On the day

of the announcement, Condroyer sold all the options and realized a net profit of $2.8 million on his $42,000 investment. Condroyer made no other purchases from this account.

Condroyer characterizes the timing of his purchases as merely "fortuitous." Def.'s Mot. to Dismiss 8 [Doc. No. 19-1]. But the highly suspicious timing supports a reasonable inference that Condroyer's purchases were more than this. See SEC v. Ginsburg, 362 F.3d 1292, 1299 (11th Cir. 2004) ("The larger and more profitable the trades, and the closer in time the trader's exposure to the insider, the stronger the inference that the trader was acting on the basis of inside information."); SEC v. Scoppetoulo, No. 10-cv-20475, 2011 WL 294443, at *3 (S.D. Fla. Jan. 27, 2011) ("Suspicious timing trading may support an inference of bad faith and scienter."); O'Brien Envtl. Energy, Inc., 1999 WL 310550, at *3 (holding plaintiff's insider trading claim survived relaxed Rule 9 standard because the defendant's sale of its entire portfolio just hours before a "bad news" announcement was an "extraordinary circumstance[]" that "provide[d] substantiation and plausibility" for the claim, despite no facts indicating the source of a tip). Thus, the SEC's charge of insider trading it not merely "speculation and conclusory allegations," Def.'s Reply Br. 7 [Doc. No. 24 at 13]; it is a reasonable inference based on the suspicious facts pled in the complaint.

Moreover, this is the type of case the relaxed Rule 9(b) standard is meant to allow to go forward. In Energy Factors Inc. v. Nuevo Energy Co., the complaint alleged "the identity of the alleged tipper, tippee, and the contents of the alleged tip, solely 'on information and belief.'" Energy Factors Inc. v. Nuevo Energy Co., No. 91-cv-4273(RLC), 1991 WL 259425, at *4 (S.D.N.Y. Nov. 22, 1991). The court acknowledged that such a pleading would not normally meet the particularity requirement of Rule 9(b). Id. However, the court applied the relaxed standard, explaining:

> Here, the details of who the alleged tipper was, when and to whom he tipped the inside information, and what exactly that inside information was, are all within the control of the defendant[]. At this stage of the proceeding, before any discovery has been allowed, to require the plaintiff to produce more concrete evidence of these details would put a heavy burden on plaintiff and would practically preclude the possibility of pleading an adequate complaint in cases, such as insider trading, that are profoundly secretive in nature.

Id. The court also noted that a statement of facts upon which the belief is founded must accompany the allegation of fraud and the complaint "must give the defendant fair notice of the basis of plaintiff's claim such that [he] may prepare an adequate defense." Id. at *5; see also Ziemba, 256 F.3d at 1202 (describing the purpose of the Rule 9(b) heightened standard as "alerting defendants to the precise misconduct with which they are charged

and protecting defendants against spurious charges of immoral and fraudulent behavior" (internal quotations omitted)).

Here, the SEC's complaint alleges one less piece of information than in Energy Factors: the identity of the tipper.[5] Notwithstanding the lack of a specified tipper, the complaint alleges enough specific facts to allow the SEC to go forward. It provides Condroyer with fair notice of his accused misconduct: trading on non-public information that he obtained either in violation of a fiduciary duty or other relationship of trust or confidence, or from someone else breaching such a duty. Accord O'Brien Envtl. Energy, Inc., 1999 WL 310550, at *6 (finding "substance of the alleged tip and circumstances of [the defendant's] alleged sale . . . provide defendant with 'fair notice' of the precise fraudulent conduct with which it is charged—namely, the sale of 1.08 million shares of O'Brien stock on September 15, 1993 while in knowing possession of inside information concerning the adverse news O'Brien would announce the next day.") The precise nature of the source is, at this point, peculiarly within Condroyer's knowledge and control. Moreover, as discussed above, Condroyer's extraordinary sequence of conduct in the two weeks before Sanofi announced its acquisition of Chattem

---

[5] In the light most favorable to the plaintiff, the tippee is Condroyer; the content of the tip is the impending acquisition of Chattem.

provide adequate circumstantial factual evidence to create a strong inference of fraud and survive the Rule 9(b) challenge. <u>See</u> <u>Scoppetoulo</u>, 2011 WL 294443, at *4.

## III. Conclusion

For the reasons discussed above, the defendant's motion to dismiss [Doc. No. 19] is DENIED.

SO ORDERED, this <u>28th</u> day of September, 2011.

<u>/s/ Charles A. Pannell, Jr.</u>
CHARLES A. PANNELL, JR.
United States District Judge

22